UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARK STEPHEN WICKLUND,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>JAMES F. PAGE, an individual, dba<br>ASCERTAIN POLYGRAPH<br>SERVICES, dba TREASURE<br>VALLEY POLYGRAPH, and IDAHO<br>DEPARTMENT OF CORRECTIONS,<br><br>　　　　　　　　Defendants. | Case No. 1:09-cv-671-EJL-CWD<br><br>**REPORT AND RECOMMENDATION** |

## REPORT

## INTRODUCTION

Plaintiff Mark Wicklund ("Wicklund") alleges that Defendant James Page ("Page") violated Wicklund's Fifth Amendment privilege against self-incrimination and committed battery by negligently conducting a polygraph examination when Wicklund lacked the mental capacity to consent or waive his Fifth Amendment Rights. Wicklund asserts a

**REPORT AND RECOMMENDATION - 1**

constitutional claim under 42 U.S.C. § 1983, as well as state law claims for negligence and battery. (Am. Compl., Dkt. 1.) [1]

Before the Court is Page's second motion for summary judgment, filed on October 11, 2011. (Dkt. 69.) Additionally, the Court has before it Page's motion to dismiss and Wicklund's motion to continue. (Dkt. 79, 83.) The parties have fully briefed the motions and they are now ripe for the Court's consideration. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and the record. Accordingly, in the interest of avoiding delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motions will be decided on the record before this Court without oral argument. Dist. Idaho L. Rule 7.1(d).

For the reasons explained below, the Court recommends that Page's motion for summary judgment be granted, and consequently, both the motion to dismiss and the motion to continue be denied as moot.

## FACTS

### 1. Procedural History

On January 21, 2011, Page filed his first motion for summary judgment seeking to resolve all three claims on the grounds that Wicklund knowingly and voluntarily consented

---

[1] The only other Defendant, Idaho Department of Correction, filed a motion for summary judgment, and the Court's Report and Recommendation recommending dismissal was adopted on August 2, 2011. (Dkt. 35, 43, 65.) The Idaho Department of Correction was dismissed from this lawsuit on August 4, 2011, upon entry of judgment. (Dkt. 66.)

**REPORT AND RECOMMENDATION - 2**

to the polygraph examination. (Dkt. 41.) Wicklund opposed the motion, asserting he was suffering withdrawal from prescription narcotics and therefore lacked the ability to knowingly consent because he was unaware of what was happening to him. Wicklund asserts that the information learned via the unlawful polygraph examination was used against him in a later criminal proceeding whereby his probationary period was extended another three years.

The Court conducted a hearing on May 16, 2011, expressly directing the parties to address the issue of proximate cause. (Dkt. 53, 54.) The Court issued a Report and Recommendation on May 25, 2011, recommending that the motion for summary judgment be denied. The Court explained that causation, an essential element of Wicklund's prima facie case, was not properly alleged in the Complaint, and recommended leave be given to Wicklund to file an amended complaint. In addition, the Court explained it was lacking information in the record to support the parties' respective positions. The District Judge adopted the Report and Recommendation on July 25, 2011, directed Wicklund to file an amended complaint by August 9, 2011, and allowed limited discovery.

The Amended Complaint, filed on August 10, 2011, addresses the causation issue by alleging the following additional facts to support Wicklund's claim that the results of the polygraph examination were used against him in his probation revocation hearing:

> 15. During the time the polygraph examination, including the pretest interview, Plaintiff's probation officer, Brandon Sutherland, was present and observed the examination via closed circuit video monitors. Brandon Sutherland was able to listen to the audio of the polygraph examination as it occurred.

**REPORT AND RECOMMENDATION - 3**

16. The polygraph examination, a copy of which has been attached to this Complaint, indicates that Defendant Page elicited that [sic] statements from Plaintiff relating to his use of Myspace.com and his contact with individuals he met there.
17. This information was not previously known to Mr. Sutherland.
18. This information was used against Mr. Wicklund in violation of his Fifth Amendment rights as it formed a significant basis for his testimony at the probation violation hearing in this matter. Much of Mr. Sutherland's testimony was based on the information obtained during both the pretest interview and the actual polygraph examination.

*\*\**

25. The information obtained during the polygraph examination, including pretest interview, was used against Mr. Wicklund during the subsequent criminal proceeding in that Mr. Sutherland testified regarding information he learned in the pretest interview during the probation violation hearing.

(First Am. Compl. Dkt. 67.)

In support of his second motion for summary judgment, Page submitted the complete transcript of the probation violation hearing conducted by Ada County District Judge Thomas Neville on August 6, 2008. (Decl. of Klaas Ex. 1, Dkt. 70.) In addition, the video tape recording of the polygraph examination conducted by Page is part of the record, as are all affidavits submitted in support of and opposition to the first motion for summary judgment.

## 2. Undisputed Facts[1]

On May 8, 2001, Wicklund was indicted by a grand jury on felony charges and later entered a plea of guilty on August 27, 2001, to the charge of sexual battery of a minor child

---

[1] The Court has excerpted portions of the undisputed facts from its August 6, 2010 Report and Recommendation, and has cited to the record accordingly. The Court also has considered other materials in the record. *See* Fed. R. Civ. P. 56(c)(3).

age 16/17 years of age. (Aff. of Klaas Ex. 1, Dkt. 41-1.) On November 15, 2001, Ada County District Judge Thomas Neville entered a judgment of conviction, an order suspending execution of the judgment, and an order of probation. (*Id.* Ex. 6, Dkt. 41-9.) The court sentenced Wicklund to incarceration for a term of seven years, with two years fixed and five years indeterminate, which sentence was suspended and a seven year probationary period imposed instead. (*Id.*) The terms of probation required supervision and specifically prohibited Wicklund from having any access to "on-line or internet computer service, including e-mail" without permission from his supervising officer. (*Id.*)

On January 3, 2008, Wicklund's probation officer, Brandon Sutherland, learned that Wicklund had a current account on a social internet network, MySpace.com. (Aff. of Klaas Ex. 2, Dkt. 41-5.) On January 4, 2008, Officer Sutherland conducted a search of Wicklund's computer and confirmed that Wicklund had a current account on MySpace.com. (*Id.*) One of Wicklund's "friends" on MySpace.com listed the individual's age as sixteen years old. (Decl. of Klass Ex. 1, Dkt. 70-1 at 12.) The computer also allegedly contained sexually explicit images and password protection software. (*Id.*)

On January 4, 2008, Wicklund was arrested on charges that he had violated the conditions of his probation and he was taken into custody at the Ada County Jail in Boise, Idaho. (Aff. of Wicklund ¶ 5, Dkt. 44.) Seven days later, on January 11, 2008, he was transported from the Ada County Jail to the office of Defendant James F. Page ("Page"), where Page administered a polygraph examination to help determine whether Wicklund in

**REPORT AND RECOMMENDATION - 5**

fact had violated the conditions of his probation. (Am. Compl. ¶ 12, Dkt. 67; Aff. of Page, Dkt. 35-4.)

Wicklund alleges that, when his probation officer arrested and transported him to the Ada County Jail on January 4, 2008, he was taking Norco, a narcotic for which he had a prescription. (Aff. of Wicklund ¶¶ 2–3, Dkt. 44.) Jail regulations prohibit inmates from taking narcotics and, as a result, Wicklund was not permitted to continue taking his prescribed pain medications while he was incarcerated. (Aff. of Wicklund ¶ 5, Dkt. 44.)

Before administering the polygraph examination on January 11, 2008, Page provided and orally read to Wicklund a written consent form. (Third Aff. of Page Ex. 2, Dkt. 41-14.) The consent form stated that Wicklund was submitting to the polygraph examination voluntarily, and provided notice that the person being examined could remain silent and could exercise that right at any time. (*Id.*) The polygraph report Page prepared indicated he asked Wicklund three questions, all of which related to whether Wicklund used MySpace.com as a resource for meeting underage sexual partners. (*Id.*) The report scored Wicklund's answers to those questions as "deceptive." (*Id.*)

The prosecutor filed a motion for bench warrant for probation violation on January 23, 2008, which contained six alleged probation violations. (Decl. of Klass Ex. 6, Dkt. 70-6.) The allegations were that Wicklund had violated the terms of his probation on the following grounds: (1) he unlawfully had internet access; (2) he had password protected files; (3) he initiated, maintained, or established contact with a person under eighteen years

**REPORT AND RECOMMENDATION - 6**

of age; (4) he had unapproved contact with a minor; (5) he possessed sexually explicit

magazines and videotapes; and (6) he failed to submit to and pass an issue specific

polygraph examination as ordered by the Court.[2] (*Id.*) The motion was amended on May

13, 2008, and included only the following allegations: (1) Wicklund had internet access

that was not work related; (2) his computer contained a password protected file; and (3) his

computer contained sexually explicit pictures. (Aff. of Klaas Ex. 1, 7, Dkt. 41-4, 41-10.)

### The Probation Violation Hearing

A hearing was held on August 6, 2008, regarding the alleged probation violations

contained in the amended motion. (Aff. of Klaas Ex. 8, Dkt. 41-11.) According to the

exhibit list, the prosecutor introduced the MySpace.com page from Wicklund's computer;

Wicklund's MySpace.com friend's list page; the sex offender agreement of supervision;

and two defense exhibits submitted by Wicklund. (Aff. of Klaas Ex. 3, Dkt. 41-6.) The

court also had before it Officer Sutherland's violation report, which summarized the results

of the polygraph examination Page conducted on January 11, 2008. (Aff. of Klaas Ex. 1,

Dkt. 70-1 at 5—6, 26.)

The prosecutor, Shelley Armstrong, questioned Officer Sutherland about the

probation violations. Officer Sutherland testified that, on January 3, 2008, he received a tip

from another probation officer that Wicklund had a MySpace profile. (Decl. of Klass Ex. 1

at 32, Dkt. 70-1 at 9.) Officer Sutherland confirmed Wicklund's photograph was associated

with Wicklund's MySpace page, and that internet service for anything other than

---

[2] Absent any other evidence in the record suggesting otherwise, the Court assumes that the reference to the polygraph examination refers to the January 11, 2008, examination Page conducted of Wicklund.

**REPORT AND RECOMMENDATION - 7**

work-related purposes was prohibited by Wicklund's sex offender agreement of supervision. (*Id.*, Dkt. 70-1 at 10–11.)

Officer Sutherland was able to view Wicklund's MySpace.com page and profile because it was public. He identified that one of Wicklund's "friends" was a young male sixteen years of age. (*Id.*, Dkt. 70-1 at 12.) On January 4, 2008, Officer Sutherland visited Wicklund's home, discussed the MySpace page with Wicklund, and seized his computer for later examination. (*Id.*) The confiscated computer contained picture files with pornography, and Wicklund confirmed that he was utilizing MySpace to meet people. (*Id.* Dkt. 70-1 at 6, 14.) Officer Sutherland talked again to Wicklund about his MySpace page on January 11, 2008, and at that time Wicklund admitted to Officer Sutherland that he had a conversation with the allegedly underage friend he had met first through MySpace via MySpace's e-mail application. (*Id.* Dkt. 70-1 at 15.)

On cross-examination, Wicklund's attorney repeatedly questioned Officer Sutherland about the polygraph test Wicklund had taken on January 11, 2008, to which the prosecutor objected. (*Id.* Dkt. 70-1 at 16—17, 21.) Officer Sutherland was questioned also about the conversation he had with Wicklund on January 11, when Wicklund was taken in for his polygraph examination. (*Id.* Dkt. 70-1 at 19.) Officer Sutherland testified that he was aware Wicklund was not allowed to have Norco while in the Ada County Jail, and that, during his conversation with Wicklund about his MySpace page before Page had started the polygraph examination, "to me he did not seem lucid." (*Id.* Dkt. 70-1 at 19.) It was during this "non-lucid state" that Wicklund stated he had contacted the allegedly underage

**REPORT AND RECOMMENDATION - 8**

boy who "friended" him on MySpace. (*Id*. Dkt. 70-1 at 20.) In addition, Officer Sutherland

described Wicklund as "argumentative" and "uncomfortable being in Ada County Jail."

(*Id*. Dkt. 70-1 at 19.)[3]

The court issued both oral findings at the conclusion of the August 6, 2008 hearing,

and a written ruling, on the motion for probation violation. (*Id*. Dkt. 70-1 at 27—28.) At the

conclusion of the hearing, Judge Neville explained there was no justification for

Wicklund's MySpace participation, considering the MySpace profile indicated Wicklund

was "looking for a . . . boy Friday." (*Id*. Dkt. 70-1 at 27.) The court therefore found that

Wicklund violated the conditions of his probation as charged in allegation number one by

having internet access that was not work related, and dismissed allegations two and three.

(*Id*., Dkt. 70-1 at 27; Aff. of Klaas Ex. 8, Dkt. 41-11.) Rather than impose incarceration, the

court ordered that probation be reinstated and extended through November 13, 2011, and

that Wicklund's internet access be suspended indefinitely. (Dkt. 70-1 at 30; Aff. of Klaas

Ex. 8, Dkt. 41-11.)

---

[3] In a prior affidavit, Wicklund stated that "Mr. Sutherland admitted that I was not lucid at the time of the polygraph examination or my signing of the waiver form," and submitted a portion of the audio recording from the August 6 probation violation hearing. (Aff. of Wicklund Ex. A, Dkt. 44.) At the time, the Court was without the benefit of the entire transcript, and accepted Wicklund's characterization, as it was required to do pursuant to Fed. R. Civ. P. 56. (Report and Recommendation, Dkt. 56 at 6.) However, the Court now rejects Wicklund's prior characterization of Officer Sutherland's testimony. The verbatim written transcript is part of the record, and is cited above. At no time did Wicklund's attorney question Officer Sutherland about Wicklund's lucidity during the polygraph examination, nor did Officer Sutherland comment upon Wicklund's ability to understand the waiver form. The questioning at the August 6 hearing was limited to the conversation Officer Sutherland had with Wicklund on January 11, prior to the polygraph examination taking place, and the topic was limited to Wicklund's admission of chatting with an allegedly underage individual through the use of MySpace.

**REPORT AND RECOMMENDATION - 9**

**The Polygraph Examination**

Wicklund claims that his withdrawal from medication after his arrest on January 4, 2008, and before the polygraph examination on January 11, 2008, made him physically ill, incoherent, and unable to think clearly. (Am. Compl. ¶¶ 10–12, Dkt. 67; Aff. of Wicklund ¶ 6, Dkt. 44.) Given his mental state, he claims that he does not recall the polygraph examination or signing a consent or waiver, and that he was suffering from "detoxing from Norco" that rendered him incoherent on January 11, 2008. (Aff. of Wicklund ¶¶ 10, 12 Dkt. 44.) Wicklund therefore alleges that he lacked the ability to waive his Fifth Amendment right to protection from self-incrimination, the ability to consent to the polygraph examination, and the ability to respond to the questions that Page asked. (Am. Compl. ¶ 22, Dkt. 67.) Wicklund also contends that Page was aware of his impaired condition when Page conducted the polygraph examination. (Am. Compl. ¶ 22, Dkt. 67.)

Chip Morgan, another polygraph examiner who worked with Page in the same office suite, was present in the office on January 11, 2008. Morgan saw Wicklund and Officer Sutherland before Page administered the polygraph examination, and submitted an affidavit in opposition to Page's first motion for summary judgment describing Wicklund as:

> 3.   ... in distress. He was limping heavily, had completely sweated through his ACSO Jail coveralls, was breathing heavily and appeared very white in his face. As he sat in a chair, I could see sweat all over his face.
> 4.   I knew from my limited medical training, acquired from taking first aid classes over 31 years as a law enforcement first responder, that the combination of sweating and having a pasty-white complexion could be the signs of trouble medically. As Mr. Wicklund was a very heavy man (I

**REPORT AND RECOMMENDATION - 10**

guessed him to be approximately 500 pounds at that time) I was specifically
worried about heart problems.

5.   I spoke with Mr. Wicklund about the situation and the reason he was at
our office. He didn't seem to "track" with me in conversation and couldn't
explain to me why he was at my office.

6.   I then asked him what was wrong with him physically. He told me that he
was in withdrawals from a prescription pain medication Norco. . .

7.   ... I informed Officer Sutherland that in my opinion Mr. Wicklund was
not medically fit to undergo a polygraph examination. . . .

8. ... I told James [Page] that I thought Mr. Wicklund was in drug
withdrawals and was not suitable for a polygraph . . . .

10.   My impression of Mr. Wicklund's condition was that he was in obvious
distress and in obvious pain. His heavy sweating and ashen complexion,
coupled with gasping for breath, indicated to me that he shouldn't take a
polygraph examination.

(Aff. of Morgan ¶¶ 3—10, Dkt. 45.)

Page insists that Wicklund did not appear to be suffering from any mental

competency impairment due to drugs or alcohol, and appeared capable of understanding

and waiving his rights as described in the consent form. (Third Aff. of Page ¶ 13, Dkt.

41-12.) Page submitted the videotape recording of the polygraph examination to the Court

to support his motion for summary judgment. (Third Aff. of Page ¶ 10 Ex. 1, Dkt. 41-12.)

The Court has reviewed the videotape of the polygraph examination.[4] The tape

recording begins with Wicklund, who is a large man, possibly weighing over 300 pounds,

---

[4] There are no allegations that the videotape recording was altered in any way, or any contention that it
depicts anything other than what occurred on January 11, 2008. Wicklund has not objected to the Court's
consideration of the videotape evidence other than to point to Morgan's affidavit and argue that Morgan's
testimony "contradicts the notion that Wicklund was capable of giving valid consent to the examination."
(Response at 5, Dkt. 71.)

**REPORT AND RECOMMENDATION - 11**

seated in Page's office in front of a desk, sitting calmly, and appearing relaxed.[5] He does not appear to be in distress, and in response to questioning about his Norco usage, Wicklund does not tell Page he feels ill, or is in pain. Wicklund appropriately responds to questions, and answers questions in complete sentences. When asked to review the waiver, Wicklund only states he cannot read it because he cannot see it. Page therefore reads it to Wicklund verbatim, and informs Wicklund he can remain silent and refuse the test. Wicklund is attentive while Page reads the form. When Page is finished reciting the form, Wicklund reaches across the table for the form, and he signs it.

Following this exchange, Page begins to question Wicklund about his MySpace account for the next ten minutes. During the pre-examination interview, Wicklund provides coherent answers to Page's questions, offers information beyond the specific questions, and asks questions of his own. When asked if he is looking to "clear himself," Wicklund responds "yes." Page then asks Wicklund if that is why he is cooperating, to which Wicklund responds "yes," again. At about twenty-two minutes into the recording, Page leaves the room. Wicklund is left alone for approximately eight minutes. During this time, Wicklund appears calm, even twiddling his thumbs at one point. He leans back in his chair, clasping his hands behind his head, and there are no sweat stains visible under his arms. His orange jail uniform hangs loosely about his frame. He at times rests his head on his hand, which is in turn supported by his elbow leaning on the desk. He does not, however, wipe his brow or gasp for breath at any time.

---

[5] The video recording is available in the record at Dkt. 55, in the Clerk of the Court's case file, and is filed under seal.

**REPORT AND RECOMMENDATION - 12**

When Page re-enters the room, Page continues to question Wicklund about his MySpace activities. Wicklund then asks to go use the restroom. Wicklund does so, and can be seen rising readily from the chair and walking out of the room with a slight limp. Upon Wicklund's return to the room, he exhibits slightly heavy breathing before he sits back in the chair. Approximately forty minutes into the videotape, Page reviews the list of questions that Page will ask Wicklund during the polygraph examination. Wicklund asks questions to clarify the polygraph questions, and ultimately expresses that he is fine with the questions to be asked. At that point, Page directs Wicklund to another chair, Wicklund rises from his seat, maneuvers to the motion sensor chair, and sits down without assistance. Page then connects the polygraph equipment.

To hook up the equipment, Page asks Wicklund to lean forward so Page can loop a strap around Wicklund's chest and under his arms. Wicklund is seen cooperating, by lifting his arms. A second strap is fastened around Wicklund's chest in the same manner, again with Wicklund cooperating by lifting his arms. Two finger sleeves are placed over the index fingers of each of Wicklund's hands, one to measure blood pressure, and the other to measure galvanic skin response. Wicklund holds out his hands to allow Page to affix the finger sleeves. When finished, Page asks Wicklund if he has any questions, Wicklund responds, "No," and he agrees that all of his concerns have been resolved. The test then begins.

At minute fifty-one, the first round of the test is completed. Page asks Wicklund if he is feeling okay, and if he is dizzy. Wicklund responds, "No," that he is "just real tired,"

because he has a lot on his mind and he cannot sleep in jail. Wicklund then states that he is sweating because "it's hot in here," to which Page responds by telling Wicklund that the thermostat is controlled by another office. Then, a second test begins, with the same questions asked. Wicklund follows directions, and is seated calmly throughout the second test. At its conclusion, Page asks how Wicklund is "holding up," and Wicklund responds only that "I'm hot" and he has a "tickle in his throat" because his throat is dry.

At minute fifty-eight, the third and final test begins, with the same questions in a different order. Again, Wicklund follows directions, and is seated calmly. At the test's conclusion, Wicklund calmly waits for the results, although he states he is "pretty nervous." Page asks to photograph Wicklund's face for his file, and Wicklund turns toward the camera. Page then takes the finger sleeves and straps off of Wicklund, and tells Wicklund he can move to the other chair. Wicklund does so without difficulty.

Page discusses the results, and another conversation ensues. Wicklund calmly accepts the results, and appropriately engages in conversation with Page. After one hour and ten minutes have passed, Page again leaves the room. For the remainder of the recording, Wicklund remains seated in a chair, and is seen fiddling with a wristband on his left wrist. He clasps his hands and rests them on the desk, scratches his chin, leans back in the chair, wipes some dust off the desk, and picks at his fingernails. The recording then concludes after one hour and twenty minutes of recorded time.

**REPORT AND RECOMMENDATION - 14**

**DISPOSITION**

**1.     Summary Judgment Standards**

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides, in pertinent part, that judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

A moving party must show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). It is not enough for the [nonmoving] party to "rest on mere allegations or denials of his pleadings." *Id*. Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250.

In determining whether a genuine issue of material fact exists, facts and inferences must be viewed most favorably to the non-moving party. To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law. *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th

Cir. 1981). However, it is not for the Court to determine the credibility of affiants or weigh

the evidence set forth by the non-moving party. All inferences that can be drawn from the

evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*,

809 F.2d at 630-31 (internal citation omitted).

The United States Court of Appeals for the Ninth Circuit has emphasized that

summary judgment may not be avoided merely because there is some purported factual

dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts*

*Corp.*, 976 F.2d 497, 500 (9th Cir. 1992). The Ninth Circuit has found that, to resist a

motion for summary judgment,

> the non-moving party: (1) must make a showing sufficient to
> establish a genuine issue of fact with respect to any element for
> which it bears the burden of proof; (2) must show that there is
> an issue that may reasonably be resolved in favor of either
> party; and (3) must come forward with more persuasive
> evidence than would otherwise be necessary when the factual
> context makes the nonmoving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882

F.2d 371, 374 (9th Cir. 1989).

## 2.   *Fifth Amendment Privilege Against Self-Incrimination*

To state a claim under Section 1983, a plaintiff must allege a violation of a

constitutional or federal statutory right proximately caused by conduct of a person acting

under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). A prima

facie case under Section 1983 requires four elements: "(1) a violation of rights protected by

**REPORT AND RECOMMENDATION - 16**

the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton*, 947 F.2d at 1420.

The threshold inquiry for a Section 1983 action is "whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan*, 443 U.S. 137, 140 (1979). The Fifth Amendment provides, in pertinent part, that no person "shall be compelled in any criminal case to be a witness against himself." Next, the plaintiff must establish that the defendant's actions "caused" the constitutional deprivation. 42 U.S.C. § 1983; *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). Coercive police questioning, in and of itself, does not violate the Fifth Amendment unless the statements obtained through that questioning are subsequently "used" in a "criminal case." *Chavez v. Martinez*, 538 U.S. 760, 766–67 (2003) (Thomas, J., joined by Rehnquist, C.J., O'Connor, J., and Scalia, J.).

The Amended Complaint alleges that, during the pre-test interview and the polygraph examination, Officer Sutherland elicited statements from Wicklund without his consent, in violation of his Fifth Amendment right against self-incrimination, and that such statements formed a "significant basis for [Sutherland's] testimony at the probation violation hearing." Therefore, Wicklund asserts that the incriminating information was actually used against Wicklund during a later criminal proceeding. Wicklund's claim fails for three reasons: (1) probation revocation proceedings are not "criminal proceedings;" (2) the statements were not used; and (3) Wicklund's assertions are not supported by the evidence in the record.

**REPORT AND RECOMMENDATION - 17**

In general, probationers are not entitled to invoke the privilege against self-incrimination in response to questions about their probation status. *United States v. Gonzalez-Mares*, 752 F.2d 1485, 1490 (9th Cir. 1985) (citing *Minnesota v. Murphy*, 465 U.S. 420, 534 n.7 (1984)). In dicta, the United States Supreme Court in *Murphy* noted that the Fifth Amendment privilege is not available when a defendant is being questioned about violations of conditions of probation that do not constitute a new criminal act, because the answer cannot be used to incriminate the probationer in another crime even though the answer may lead to revocation of probation. *Murphy*, 465 U.S. at 534 n.7. Therefore, the threat of probation proceedings are not considered criminal proceedings for purposes of invoking the Fifth Amendment privilege. *Gonzalez-Mares*, 752 F.2d at 1490.[6]

Wicklund now concedes that probation revocation proceedings do not implicate the Fifth Amendment. Moreover, the information Officer Sutherland learned from the polygraph examination was not elicited for the purpose of charging Wicklund with a new crime, nor was he charged with one. Rather, the probation violation was solely concerned with Wicklund's use of the internet for non-work related purposes.

Second, the statements were not used. Although the initial motion for probation violation mentioned the polygraph results as one of the six violations, the parties proceeded on an amended motion containing only three alleged violations. The results of the

---

[6] The Court in its prior Report and Recommendation concluded, on the basis of the record and briefing before it at that time, that the probation revocation proceedings at issue in this matter likely constituted a "criminal proceeding" for the purposes of the Fifth Amendment. The Court was unable to discern, based upon the record before it, whether a new crime had been charged in the probation violation motion. Upon further reflection, and in light of additional, more comprehensive briefing and a more complete record, as well as complete identification of the issues by the parties, the Court has revised its prior conclusion.

**REPORT AND RECOMMENDATION - 18**

polygraph test were not relied upon by either the state in its amended probation violation motion, or by Judge Neville in his ruling. Nor was Officer Sutherland questioned about the polygraph results. Rather, Officer Sutherland testified about what he knew on January 3 and 4, 2008, which was that Wicklund had created a public MySpace profile for the purpose of meeting people, and Wicklund was prohibited from using the internet for anything other than work purposes. Judge Neville's ruling imposing three additional years of probation was based solely upon that testimony, and the pages printed from MySpace by Officer Sutherland on January 3, 2008; his ruling was not based on the results of the polygraph report. Therefore, there was no "use" of the information.

Third, Wicklund's allegations that Officer Sutherland's testimony was based upon information he learned during the polygraph examination are not supported by the complete record now before the Court. The Court has compared the videotaped recording of the polygraph examination and the complete written transcript of the probation violation hearing. Wicklund alleges that Page elicited statements from him about his use of MySpace.com "not previously known" to Officer Sutherland, which "formed a significant basis" for Officer Sutherland's testimony, which in turn was based upon information obtained during the pretest interview and the actual polygraph examination. However, during the probation violation hearing, the only question posed to Officer Sutherland about his conversation with Wicklund prior to the polygraph test concerned Wicklund's admission of chatting with an allegedly underage individual via MySpace. That testimony was neither extensive nor significant, considering Judge Neville did not rely upon it in

**REPORT AND RECOMMENDATION - 19**

rendering his ruling. Moreover, the more than one hour videotape recording contained a wealth of information that never found its way into the proceedings on August 6, 2008. The primary focus of the prosecutor's questioning concerned what Officer Sutherland knew on January 3 and 4, not what he learned from Wicklund or the polygraph examination on January 11, 2008.

### 3.    Request to Amend the Complaint

Apparently conceding defeat on his Fifth Amendment claim, Wicklund argues he should be permitted to assert a claim under the Fourth Amendment, because his claim for battery allegedly supports an excessive force claim. Page argues the request to amend is both untimely and futile, because no seizure occurred and Wicklund's battery claim is insufficient to support a claim under the Fourth Amendment.

Fed. R. Civ. P. 15 permits amendment of the pleadings before trial, during trial, and after trial. Rule 15(a)(2) permits a party to amend its pleadings prior to trial with leave of the court, and the court "should freely give leave when justice so requires." *See Bonin v. Calderon*, 59 F.3d 815 (9th Cir. 1995).[7] The Ninth Circuit has stated that in assessing the propriety of a motion to amend, it will consider five factors: "(1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the [party] has previously amended his [pleadings]." *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004). Futility alone can be enough to deny a motion for leave to amend. *Id*. In *Bonin v.*

---

[7] Rule 15 applies here rather than the more restrictive Rule 16 "good cause" standard, because the Court has not entered a comprehensive scheduling order due to the extensive, early motion practice. Rather, the Court entered a limited order on July 25, 2011, allowing the parties to conduct discovery for purposes of filing a second motion for summary judgment. (Dkt. 64.)

**REPORT AND RECOMMENDATION - 20**

*Calderon*, the Ninth Circuit found the "proffered amendments would be nothing more than an exercise in futility." 59 F.3d 815, 845 (9th Cir. 1995). That court also noted that the district court did not abuse its discretion in denying the motion to amend because the moving party presented "no new facts but only new theories and provide[d] no satisfactory explanation for his failure to fully develop his contentions originally." *Id*.

In the instant case, and in the exercise of its discretion, the Court finds that the delay alone is grounds to deny Wicklund's request. Wicklund has presented no new facts, only a new theory for salvaging his constitutional claim. No explanation is given for his failure to fully develop his constitutional claims originally. Moreover, this Court already has given Wicklund an opportunity to correct his deficient pleading. Finally, to request an additional amendment at this late date, when the matter has been pending since December 22, 2009, and the facts have been known to Wicklund since January of 2008, smacks of bad faith as well.

In addition, further amendment to the already amended complaint would prove futile. Not every push or shove violates the Fourth Amendment. *Graham v. Conner*, 490 U.S. 386, 398 (1989) (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973), *overruled on other grounds* by *Graham*). Thus, even though the "least touching of another in anger is a battery," it is not a violation of a constitutional right actionable under Section 1983. *Johnson*, 481 F.2d at 1033. Rather, a prisoner cannot be subjected to excessive force, meaning gratuitous or disproportionate force that has no object but to inflict pain. *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).

**REPORT AND RECOMMENDATION - 21**

In the instant case, even assuming Wicklund has sufficiently asserted a battery claim,[8] the "force" used does not rise to the level of force required under the Fourth Amendment.[9] The tape recording of the polygraph examination depicts Wicklund as cooperative and inviting the test to "clear himself." Wicklund even suggests at the end of the video recording that he would answer another question if he was given an opportunity to submit to another polygraph examination. Page affixed the chest straps and finger sleeves to Wicklund's body with Wicklund's cooperation and Wicklund made no request to remove them prematurely or otherwise. No other physical touching occurred that conceivably could rise to the level of force required for a Fourth Amendment claim. No rational trier of fact could find otherwise, and thus any amendment to assert a claim under the Fourth Amendment would be futile.

**4.      Wicklund's State Law Claims for Negligence and Battery[10]**

Page next seeks summary judgment on Wicklund's state law claims for negligence and battery. Page asserts that Wicklund expressly consented to the polygraph examination, thereby precluding his battery claim, and that there is no causal relationship between the statements uttered and Wicklund's resulting damages to sustain the claim for negligent administration of the polygraph test. Wicklund argues that summary judgment is not warranted because there are disputed issues of material fact concerning whether Wicklund

---

[8] The Court discusses Wicklund's state law claim for battery later in its Report and Recommendation.
[9] Wicklund had already been "seized" by virtue of his probation violation, and was incarcerated at the time of the polygraph test. He was required to submit to polygraph tests as part of his probation agreement.
[10] The Court chooses to exercise its jurisdiction over the state law claims given its history with this case. 28 U.S.C. § 1367(a), (c).

**REPORT AND RECOMMENDATION - 22**

consented to the polygraph examination. He relies upon the affidavit of Chip Morgan, arguing that it sufficiently rebuts the videotape recording because the tape recording cannot resolve the dispute about Wicklund's mental state and resulting ability to consent to the polygraph examination. Wicklund therefore argues Page's reliance upon *Scott v. Harris*, 550 U.S. 372 (2007), in which the court considered videotape evidence, is misplaced because it involved a police chase and objective, rather than subjective, facts.

Civil battery consists of an intentional, unpermitted contact upon the person of another which is unlawful, harmful or offensive. *Neal v. Neal*, 873 P.2d 871, 876 (Idaho 1994). Lack of consent is an essential element of battery, as is the intent to commit the act. *Neal*, 873 P.2d at 876. The elements of negligence consist of (1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage. *O'Guin v. Bingham County*, 122 P.3d 308, 311 (Idaho 2005). Both the claim for negligence and the claim for battery hinge upon Wicklund's consent, or lack thereof, to the polygraph examination because of mental impairment. Wicklund contends that because of his visible symptoms of drug withdrawal he was unable to consent to the polygraph examination, and Page therefore breached his duty of care by conducting the examination.

Wicklund describes several objective symptoms that he alleges should have placed Page on notice of his drug withdrawal symptoms, including shortness of breath, heavy sweating, incoherent speech, loss of coherent thinking, and limping. (Dkt. 44.) These

**REPORT AND RECOMMENDATION - 23**

symptoms purportedly were observed also by Morgan, but prior to the pretest interview and polygraph examination. (Dkt. 45.) Wicklund further describes that, when he was transported to Page's office, he "required physical assistance to walk," and that he was "incoherent during the polygraph examination." (Dkt. 44, ¶ 9—10.) Wicklund asserts that, based upon these observable objective symptoms, "it should have been readily apparent by my physical appearance that I was not in my right state of mind." (Dkt. 44 ¶13.)

While it is true that, at summary judgment stage, the Court must view the facts in the light most favorable to Wicklund as the nonmoving party, it must do so only if there is a "genuine dispute as to those facts." *Scott*, 550 U.S. at 380. If the record taken as a whole could not lead a rational trier of fact to find for Wicklund, there is no genuine issue for trial. *Id.* And there must be more than "some" factual dispute—the disputed facts must be both genuine and material. *Id.* If opposing parties tell two different stories, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

This is the situation presented here. Upon examination of the entire record before it,[11] including the videotape of the challenged polygraph examination, the Court concludes that Wicklund's version of events is, as in *Scott*, so utterly discredited by the record that no

---

[11] The Court in its May 25, 2011 Report and Recommendation, on the basis of the authorities cited and the limited record before it at that time, declined to comment on the videotape recording. However, in light of the additional briefing and a more complete record, the Court concludes that *Scott v. Harris* is indeed applicable to this matter, as the videotape recording does depict objective facts not capable of any genuine or material dispute.

**REPORT AND RECOMMENDATION - 24**

reasonable jury could believe him.[12] *See Scott v. Harris*, 440 U.S. at 380. Wicklund appears calm throughout the entire hour and twenty minute video. He is not breathing heavily. He is not hyperventilating. He does not wipe sweat from his brow or his face, and his clothing hangs loosely upon his large frame. There are no sweat marks visible under his arms, or anywhere else upon his jail uniform. The only time Wicklund mentions he is getting sweaty is when he comments about the hot temperature in the room, almost near the end of the examination. When asked if he is dizzy, Wicklund denies it.

Wicklund answers all questions in complete, coherent and intelligible sentences. He asks appropriate questions of Page and other individuals in the room. And he is able to rise from his chair and walk to and use the bathroom, unassisted and without anything other than a very slight limp. During the verbatim recitation of the consent and waiver form, Wicklund commented only that he could not see the form in order to read it himself, not that he could not understand it. He asked no questions before it was read to him and given the opportunity to do so, and he can be visualized reaching across the table to obtain and sign the form. And, while Page was fastening the chest strap and finger sleeves, Wicklund cooperated by lifting his arms over his head and holding out his hands to allow Page to connect the polygraph apparatus.

Wicklund wants this Court to conclude, based upon his alleged physical symptoms, that he lacked the ability to consent, and Page was negligent because he conducted the

---

[12] Wicklund asserted also in response to the first motion for summary judgment that Officer Sutherland "admitted that I was not lucid at the time of the polygraph examination or my signing of the waiver form." (Dkt. 44, ¶15.) Wicklund's characterization of Officer Sutherland's testimony is not supported by the record, as explained in Note 2, *supra*.

**REPORT AND RECOMMENDATION - 25**

polygraph examination despite such symptoms. Wicklund asserts that a jury could so conclude based upon his testimony and Morgan's testimony about his objective symptoms.[13] However, the videotape tells a completely different story. Wicklund's objective, physical appearance and demeanor do not lead to the conclusion that he was incoherent and lacked the ability to consent. The Court's conclusion in this case[14] is no different than that drawn by the court in *Harris*, wherein the court inferred that the high-speed chase posed a great risk of serious injury. The Court therefore recommends that Page's motion for summary judgment be granted regarding Wicklund's state law claims for negligence and battery as well.

## 5.    Motion to Dismiss and Motion to Continue

Page filed a motion to dismiss when Wicklund failed to appear after his attorney was granted permission to withdraw. After the motion was filed, Wicklund filed a notice of appearance, and requested a continuance of thirty days so he could obtain his files from his attorney. In light of the Court's recommendation, Page's motion to dismiss and Wicklund's motion to continue may be denied as moot.

---

[13] The Court notes that Morgan was not disclosed as an expert witness. However, Page did not object to the opinions contained in Morgan's affidavit. *See* Fed. R. Civ. P. 56(c)(2) (a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence).

[14] The Court notes that, had the facts been different, it may not have reached the same conclusion. However, Wicklund argued that his mental state was readily apparent based upon his physical symptoms. Those alleged physical symptoms simply are not present at all throughout the entire videotape.

**REPORT AND RECOMMENDATION - 26**

## CONCLUSION

Based upon the foregoing, the Court finds that there are no genuine disputed issues of material fact and that summary judgment should be granted to Defendant Page.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1) Defendant's Motion for Summary Judgment (Dkt. 69) be **GRANTED** and judgment entered for Defendant.

2) Defendant's Motion to Dismiss (Dkt. 79) be **DENIED as MOOT**.

3) Plaintiff's Motion to Continue (Dkt. 83) be **DENIED as MOOT**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **July 18, 2012**

Honorable Candy W. Dale
United States Magistrate Judge

**REPORT AND RECOMMENDATION - 27**